**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

---------------------------------------------------------------X

LADON BRUSTER, individually and on behalf of all others similarly-situated,

Plaintiffs,

v.

UBER TECHNOLOGIES, INC. and RAISER, LLC.

Defendants.

---------------------------------------------------------------X

**Case No.:**

**COMPLAINT AND JURY DEMAND**

Plaintiff LaDon Bruster brings this action on behalf of himself and all other individuals who have worked or are currently working in the State of Ohio as drivers for Defendants Uber Technologies, Inc. and Rasier, LLC (collectively, "Uber" or "Defendants"), and alleges the following:

## INTRODUCTION

1. This case is about one thing: Uber, a company valued at more than *$50 billion*, taking advantage of its struggling drivers to bolster its bottom line. Though it likes to call itself a technology company, Uber is a transportation company. Uber does not sell software. It sells rides. Thus, Uber's drivers—like Plaintiff and the Class he represents—are the lifeblood of the company. Nonetheless, to increase profits, Uber uses its position of power to mislead and take advantage of its drivers at every turn.

2. *First*, Uber refuses to pay its drivers a living wage. After accounting for drivers' expenses, which Uber should pay (but does not), most drivers barely make enough

money to make ends meet. Moreover, to further squeeze its drivers, Uber routinely misappropriates money from their fares and does not follow through on its financial commitments. Uber continues to achieve record valuations, while its drivers barely scrape by.

3. *Second*, Uber falsifies the employment status of its drivers. Though Uber exercises near complete control over its drivers and many of its drivers work the equivalent of two fulltime jobs for Uber, it improperly classifies drivers as "independent contractors," rather than "employees." Why? So they are not subject to the protections of the Ohio Labor Code and Uber does not have to pay the costs of compliance (*e.g.*, higher wages, benefits, and reimbursement of expenses).

4. *Third*, Uber misrepresents how drivers are paid so that it can retain a larger percentage of the fares generated. Uber tells customers that gratuity is included in the fares charged when they use Uber's electronic payment service, which results in customers not leaving additional tips for drivers. In reality, however, Uber fails to remit the gratuity to its drivers—instead, it lines its own pockets with the drivers' money. Uber takes the tips that drivers would otherwise receive were it not for Uber's blatant misrepresentations.

5. Plaintiff brings this action to prevent Uber from continuing to take advantage of its drivers by violating their contractual and statutory rights and to return to Uber's drivers what is rightfully theirs.

6. Accordingly, Plaintiff seeks to recover damages for Uber's numerous violations of the Ohio Revised Code: (a) failure to maintain payroll records in violation of Ohio R.C. § 4111.08; (b) failure to pay minimum wages in violation of R.C. § 4111.01, *et seq*.; (c) failure to pay wages promptly upon resignation and termination in violation of R.C. § 4115.10(A); and (d) failure to pay overtime compensation in violation of R.C. § 4111.03; and (e) failure to

timely pay and improper retention of gratuities in violation of R.C. § 4113.15, *et seq*.

7. Plaintiff also seeks to recover damages for Uber's common-law violations: (a) tortious interference with prospective business relations; (b) breach of contract; (c) promissory estoppel; (d) unjust enrichment; (e) conversion; (f) unfair competition; and (g) fraud.

**PARTIES, JURISDICTION, AND VENUE**

8. LaDon Bruster is a resident of Cuyahoga County, Ohio. Plaintiff currently works for Defendants as an Uber driver.

9. Uber Technologies, Inc. is a Delaware corporation headquartered in San Francisco, California that is authorized to conduct business and does conduct business throughout Ohio, including in Cuyahoga County. It provides a service where individuals can login to a software application on their smartphone, request a ride, and be paired with an available driver.

10. Rasier, LLC is a subsidiary of Uber Technologies, Inc. and is its equivalent for purposes of this action. It is authorized to conduct business and does conduct business throughout Ohio, including in Cuyahoga County.

11. This Court has subject matter jurisdiction over the controversy pursuant to 28 U.S.C. § 1332(a) because Plaintiff is a resident of the State of Ohio and Defendants are foreign corporations incorporated in the State of Delaware with principal offices in the State of California. The amount in controversy exceeds $75,000.

12. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because the state law claims are so closely related to the claims in which the Court has original jurisdiction that they form part of the same case or controversy.

13. Venue is proper in the Northern District pursuant to 28 U.S.C. § 1391 as the events and conduct giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

### A. Plaintiff Ladon Bruster

14. In 2014, Plaintiff began working for Uber as an UberX driver in Ohio.

15. For the previous year and a half, Plaintiff drove approximately thirty-five (35) hours per week for Uber.

16. Recently, Plaintiff's account was deactivated and he has been unable to continue driving for Uber.

17. On December 11, 2015, Defendants issued a new Technology Services Agreement, which contained an arbitration agreement. On December 16, 2015, Plaintiff opted out of the arbitration agreement by sending an e-mail to optout@uber.com and complying with the directions in the agreement.

18. Uber compensates its drivers weekly. Uber takes 20% of the total fares and the driver receives the remaining 80%. Because Plaintiff was improperly classified as an independent contractor, he had to pay all employment related expenses, including gas, tolls, car repairs, lease payment and insurance, from his portion of the fare.

19. Plaintiff was compensated approximately $350 per week and incurred approximately $200 per week in expenses.

20. Thus, after expenses, Plaintiff made an approximate income of $5.00 per hour—significantly less than the state required minimum wage.

### B. Uber Increases its Profits by Deceiving its Drivers

21. In addition to the 20% of the fare retained by Uber, it also takes $1 for each fare Plaintiff accepted. Specifically, Uber deducts a $1 "safe ride" fee from each fare, which is allegedly used to pay for background checks, driver safety education, and development of safety features in its mobile application—an expense that Uber, the employer, should pay.

22. Uber's contract with its drivers provides that drivers must be compensated $5.00 for cancelled fares, but Uber failed to compensate Plaintiff for a majority of cancelled fares.

23. Uber misled Plaintiff regarding the amount of money that drivers can earn. For example, Uber told Plaintiff that drivers can earn guaranteed money working at a certain time. However, Plaintiff did not earn the guaranteed hourly pay that Uber promised.

24. Uber also purports to offer a class to drivers who are seeking reactivation for $50 dollars. Those who complete the class are given the opportunity for reinstatement. However, Uber refused to offer the class to Plaintiff, even though this was his first time falling below the required 4.5-star minimum, and even though he raised his rating above that minimum on his own accord.

**C. Uber Increases its Profits by Misappropriating its Drivers' Tips**

25. During the course of his employment, Plaintiff did not receive gratuities.

26. Uber advertised to customers, on its website and in marketing materials, that a gratuity is included in the total cost of the fare for the car service and that there is no need to tip the driver:

DO I NEED TO TIP MY DRIVER?

You don't need cash when you ride with Uber. Once you arrive at your destination, your fare is automatically charged to your credit card on file – there's no need to tip.

27. Uber intentionally misrepresented to customers that gratuity was included in the cost of its fares and instructed passengers not to leave a tip in addition to the amount of the fare.

28. Via its training video, Uber also misrepresented to Plaintiff that tips would be added to his wages. Uber explicitly instructed Plaintiff and other drivers not to ask for or accept tips from passengers.

29. Despite Uber's misrepresentations to customers that "there's no need to tip" and misrepresentations to Plaintiff and other drivers that tips would be added to their wages, Plaintiff and other drivers failed to receive any gratuities.

30. As a result of Uber's misrepresentations to customers that gratuity is included in the cost of its service but then failing to remit any gratuity to the drivers, Plaintiff has been deprived of payments to which he is entitled and which reasonable customers would have expected them to receive.

### D. Uber Increases its Profits by Misclassifying Drivers as Independent Contractors, Rather than Employees

31. Uber uniformly misclassifies its drivers, including Plaintiff, as independent contractors when they should be classified as employees.

32. Uber is deeply involved in marketing its transportation services, qualifying and selecting drivers, regulating and monitoring drivers' performance (including disciplining or terminating those who fail to meet its employment standards), and setting prices.

33. Uber exercises substantial control over the qualification and selection of its drivers. Before working for Uber, applicants must complete Uber's application process, including a background check.

34. Uber exercises significant control and supervision over the work details of its drivers—the manner, methods, and means of its drivers' provision of transportation services. For example, upon signing an agreement to work for Uber, new drivers must watch a video demonstrating how Uber wants them to interact with customers. Drivers are even instructed on

such simple tasks as how to pick up a customer with their car. In short, Uber retains all necessary control over the drivers' performance.

35. Uber monitors its drivers to ensure compliance with Uber's quality control standards. All drivers for Uber, including Plaintiff, must maintain an average customer star evaluation of at least 4.5 out of a possible 5 stars. Instructions on how to improve one's star rating are given to drivers who fall below this average in any given week. If a driver fails to maintain an average customer rating of 4.5, the driver has 30 days to raise his rating to within the required threshold, or else Uber deactivates the driver's ability to use the application to pick up customers. Thus, monitoring through rider ratings is an effective mechanism for Uber to enforce its standards. Plaintiff's rating dropped below 4.5, but within the 30 days rose back up to the level required. However, Plaintiff was nonetheless deactivated after his rating remained at 4.59.

36. Uber also unilaterally sets the fares—with no negotiation or input from drivers—for all rides, and drivers are required to charge the cost determined solely by Uber. Uber bills customers for the entire amount before remitting a portion of the fare to drivers.

37. Uber claims a proprietary interest in its riders, which further demonstrates that Uber acts as more than a mere intermediary between riders and drivers. For instance, Uber prohibits its drivers from answering rider queries about booking future rides outside the Uber application or otherwise soliciting Uber riders.

38. As a result of the intentional misclassification of its employees, Uber failed to provide Plaintiff and other similarly aggrieved driver employees with itemized wage statements, minimum wages, and reimbursement for necessary expenses (*e.g.*, gas, tolls, car repairs, and lease payments). Uber also failed to keep accurate payroll records evidencing Plaintiff's and other drivers' hours worked and wages paid and unlawfully retained gratuities owed to Plaintiff

and other drivers, despite representing to customers and its drivers that gratuity is included in the total cost of the service. Uber also did not pay into any insurance funds, including Social Security, disability and unemployment insurance.

39. On December 16' 2015, House Bill 237 was approved by both the House and Senate. The bill will require Uber to obtain a permit from the Public Utilities Commission of Ohio, disclose how fares are calculated, provide a receipt, conduct background checks on drivers and maintain records for two years. It also specifies that drivers shall be covered by Uber's insurance plan while the driver is acting in his employee capacity.

## CLASS ACTION ALLEGATIONS

40. This action is properly maintainable as a class action pursuant to the Federal Rules of Civil Procedure ("F.R.C.P.") Rule 23.

41. Plaintiff seeks to proceed as a class action on behalf of himself and the following class of persons:

> All individuals who are currently working or have worked for Defendants as drivers within the State of Ohio.

42. Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint. Excluded from the Class are Defendants and its affiliates, parents, subsidiaries, employees, officers, agents, and directors; government entities or agencies, its affiliates, employees, officers, agents, and directors in their governmental capacities; any judicial officer presiding over this matter and the members of their immediate families and judicial staff; and class counsel.

43. The Class members are readily ascertainable. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. The number and identity of the Class members are determinable from the records of Defendants.

44. At all relevant times, Plaintiff and Class members are and have been similarly situated, have had substantially similar job requirements and pay provisions, and are and have been subjected to Defendants' decisions, policies, plans, programs, practices, procedures, protocols, routines, and rules, all culminating in willful wage and hour violations.

45. The proposed Class is so numerous that a joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the court. Although the precise number of such persons is unknown, the facts on which the calculation of that number are presently within the sole control of Defendants, upon information and belief, there are more than forty (40) members of the Class.

46. Plaintiff's claims are typical of those claims, which could be alleged by any member of the Class, and the relief sought is typical of the relief, which would be sought by each member of the Class in separate actions. All the Class members were subject to the same corporate practices of Defendants, as alleged herein. Defendants' corporate-wide policies and practices affected all Class members similarly, and Defendants benefited from the same type of unfair and/or wrongful acts as to each Class member. Plaintiff and other Class members sustained similar losses, injuries and damages arising from the same unlawful policies, practices and procedures.

47. Plaintiff is able to fairly and adequately protect the interests of the Class and has no interests antagonistic to the Class. Prosecution of separate actions by individual members of the Class would create a risk of inconsistent and/or varying adjudications with respect to the

individual members of the Class, establishing incompatible standards of conduct for Defendants and resulting in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties.

48. There are questions of law and fact common to the Class which predominate over any questions affecting only individual class members, including but not limited to:

a. Whether Defendant have charged customers a gratuity for class members' services;

b. Whether Defendant failed to distribute the total proceeds of those gratuities to the class members;

c. Whether Defendants have informed customers that gratuity is included in the price of the Uber service and so there is no need to tip the drivers;

d. Whether class members have suffered damages based upon Uber's representation to customers that there is no need to tip the drivers;

e. Whether Defendants improperly classified class members as independent contractors rather than employees;

f. Whether class members have been required to pay the expenses of their employment, including the cost of a vehicle, repairs, gas and tolls;

g. Whether Uber unlawfully denied to compensate its employees, Uber's drivers, those expenses; and

h. Whether class members were denied employee benefits as required by law.

49. The representatives and their chosen attorneys are familiar with the subject matter of the lawsuit and have full knowledge of the allegations contained in this complaint so as to be able to assist in its prosecution. In addition, the representative's attorneys are competent in the

relevant areas of the law and have sufficient experience to vigorously represent the Class. Furthermore, the resources available to counsel ensure that the litigation will not be hampered by a lack of financial capacity. Plaintiff's attorneys have sufficient financial resources and are willing to absorb the costs of the litigation.

50. A class action is superior to any other available method for adjudicating this controversy. The proposed class action is the surest way to fairly and expeditiously compensate so large a number of injured persons; to keep the courts from becoming paralyzed by hundreds, perhaps thousands of repetitive cases; and to reduce transaction costs so that the injured Class members can obtain the most compensation possible. In short, class treatment presents a superior mechanism for fairly resolving similar issues and claims without repetitious and wasteful litigation.

## CAUSES OF ACTION

### COUNT I
### TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

51. Plaintiff, on behalf of himself and the proposed Class, repeats and incorporates the allegations above as if fully set forth herein.

52. Uber interfered with the continuing business relationship between drivers and riders—a separate relationship from that between either Uber and its drivers or Uber and its riders, and one to which Uber is not a party—whereby riders would have paid gratuity to drivers, including Plaintiff, absent Uber's interference.

53. Uber intentionally and maliciously interfered with Plaintiff and other drivers' enjoyment of an expectancy of tips from passengers by intentionally misrepresenting that gratuity was included in the cost of its fares.

54. For example, Uber specifically advertises to its customers that tips are included in the cost of the fare:

DO I NEED TO TIP MY DRIVER?

You don't need cash when you ride with Uber. Once you arrive at your destination, your fare is automatically charged to your credit card on file – there's no need to tip.

55. In reality, however, Uber collected gratuities and then failed to remit them to drivers.

56. Based on its past practices of not remitting gratuities to drivers, Uber knew that it was going to retain the tips for itself when it misrepresented that tips would be passed on to its drivers.

57. Were it not for Uber's misrepresentations regarding gratuities, riders would have left a tip for drivers as is customary in the car-service industry.

58. Uber knew that this would be a benefit accruing to the drivers at the time it discouraged tipping by telling passengers tipping is included in the fare and knew the interference was certain or substantially certain to occur as a result of the conduct.

59. Uber's conduct damaged Plaintiff and other drivers.

**COUNT II**
**BREACH OF CONTRACT**

60. Plaintiff, on behalf of himself and the proposed Class, repeats and incorporates the allegations above as if fully set forth herein.

61. Uber has an implied contract with Plaintiff and other drivers to remit the total proceeds of all gratuities, as well as to reimburse for expenses.

62. Plaintiff and other drivers are third-party beneficiaries of customers' implied contract with Uber that tips would be remitted to drivers, the terms of which were incorporated

by reference from certain advertisements or statements Uber made on various webpages. By entering into this agreement, customers intended to secure a financial benefit for drivers, including Plaintiff, in the form of gratuity and to act directly for the drivers' benefit.

63. Uber withheld and continues to withhold gratuities and has not reimbursed expenses.

64. Uber contracted with Plaintiff and other drivers to pay surge fares, to provide a credit card entitling drivers to a discount on gas, and to pay $5.00 for cancelled fares.

65. Uber has failed to pay surge fares, to provide a credit card entitling drivers to a discount on gas, and to pay $5.00 for cancelled fares.

66. Uber's conduct damaged Plaintiff and other drivers.

**COUNT III**
**PROMISSORY ESTOPPEL**

67. Plaintiff, on behalf of himself and the proposed Class, repeats and incorporates the allegations above as if fully set forth herein.

68. Uber promised to remit all gratuities to Plaintiff and other drivers in their paycheck. Instead, Uber kept the tips for itself.

69. Based on its past practices of not paying tips to drivers, Uber knew at the time it made the promise that it was a lie.

70. Plaintiff and other drivers relied to their detriment on Uber's promise in continuing to drive for Uber and not seeking additional tips from passengers. It is customary to tip drivers in the car-service industry, and it was probable that drivers would have received tips but for Uber's false promise.

71. Plaintiff and other drivers' reliance was foreseeable because Uber—the entity that actually determines and pays drivers' compensation—made the false promise.

72. Uber's conduct damaged Plaintiff and other drivers.

73. Injustice can be avoided only by enforcing Uber's promise to remit all gratuities to Plaintiff and other drivers.

**COUNT IV**
**UNJUST ENRICHMENT**

74. Plaintiff, on behalf of himself and the proposed Class, repeats and incorporates the allegations above as if fully set forth herein.

75. Uber unlawfully retained gratuities and surge fares promised to Plaintiff and other drivers and did not reimburse expenses.

76. Uber obtained these benefits from drivers by making material misrepresentations and taking undue advantage of them.

77. As a result, Uber has been unjustly enriched.

78. Uber's conduct damaged Plaintiff and other drivers.

**COUNT V: CONVERSION**

79. Plaintiff, on behalf of himself and the proposed Class, repeats and incorporates the allegations above as if fully set forth herein.

80. Plaintiff and other drivers had the right to possession of tips, surge fares, cancellation fees, and money spent for expenses.

81. Uber interfered with Plaintiff and the other drivers' right to their personal property by refusing to relinquish the property to them. Instead, Uber retained the property for its own benefit.

82. The converted property was personal. For example, tips were specifically earmarked for the drivers.

83. Uber's conduct damaged Plaintiff and other drivers.

**COUNT VI**
**UNFAIR COMPETITION**

84. Plaintiff, on behalf of himself and the proposed Class, repeats and incorporates the allegations above as if fully set forth herein.

85. Plaintiff and other drivers' property—gratuities, surge fares, and cancellation fees—was misappropriated by Uber for its commercial advantage.

86. Uber's conduct damaged Plaintiff and other drivers.

**COUNT VII**
**FRAUD**

87. Plaintiff, on behalf of himself and the proposed Class, repeats and incorporates the allegations above as if fully set forth herein.

88. Uber represented to Plaintiff and other drivers that they would receive gratuities, surge fares, and cancellation fees. Uber did not pay these monies as promised.

89. These misrepresentations were material because they affected Plaintiff and other drivers' decisions to continue driving for Uber.

90. Uber knew at the time it made these misrepresentations—or, at the very least, made the misrepresentations recklessly—that it would not pass along these monies to Plaintiff and other drivers based on its past practices of not doing so.

91. Plaintiff and other drivers reasonably and justifiably relied on these misrepresentations and continued to drive for Uber because Uber was their employer and the party responsible for overseeing the payment of these monies.

92. Uber's conduct damaged Plaintiff and other drivers.

**COUNT VIII**
**VIOLATIONS OF THE OHIO REVISED CODE**

93. Plaintiff, on behalf of himself and the proposed Class, repeats and incorporates the allegations above as if fully set forth herein.

94. Despite the existence of an agreement indicating that Plaintiff and other drivers are independent contractors, Uber's treatment of and control over them indicate that they are employees who should be protected by wage and hour laws.

95. Accordingly, Uber's actions detailed above violate the following sections of the Ohio Administrative Code: (a) failure to maintain payroll records in violation of R.C. § 4111.08; (b) failure to pay minimum wages in violation of R.C. § 4111.01, *et seq*.; (c) failure to pay wages promptly upon resignation and termination in violation of R.C. § 4115.10(A); (d) failure to pay overtime in violation of R.C. § 4111.03 and (e) failure to timely pay gratuities in violation of R.C. § 4113.15 *et seq*.

96. As a result of Uber's violations, Plaintiff is entitled to recover the wages and benefits withheld in violation of Ohio Revised Code as well as attorneys' fees pursuant to R.C. § 4111.10.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the proposed Class, requests relief against Uber as follows:

a. an award of compensatory damages, punitive damages, and treble damages, as well as back pay, in an amount to be determined at trial;

b. Notice to the Class of the action;

c. An injunction prohibiting Uber and all those in concert with it from engaging in each of the unlawful practices, policies, and patterns set forth above;

d. Liquidated damages;

e. Reasonable attorneys' fees and costs;

f. An Order requiring Defendants to return to Plaintiff any gratuities and other funds wrongfully withheld by Defendants;

g. Pre-judgment and post-judgment interest at the highest rate provided by law; and

h. Such other and further relief that the Court may deem just and proper.

**JURY DEMAND**

Plaintiff, on behalf of himself and the proposed Class, demands a trial by jury on all claims so triable.

Dated: December 21, 2015

Respectfully submitted,

*/s/ John R. Climaco*

John R. Climaco (0011456)
Scott D. Simpkins (0066775)
CLIMACO WILCOX PECA
TARANTINO & GAROFOLI CO., LPA
Telephone: (216) 621-8484
Facsimile: (216) 771-1632
jrclim@climacolaw.com
sdsimp@climacolaw.com

Marie Napoli (*pro hac vice pending*)
NAPOLI LAW PLLC
1301 Avenue of the Americas, 10th Floor
New York, New York 10019
Telephone: (212) 397-1000
MNapoli@napolilaw.com

Jeanne Lahiff (*pro hac vice pending*)
IMBESI LAW P.C.
450 Seventh Avenue, Suite 1408
New York, New York 10123
Telephone: (212) 736-0007
jlahiff@lawicm.com

*Counsel for Plaintiffs*